UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

RYAN MILLIRON,

    Plaintiff,

v.                                                                                Hon. Sally J. Berens

U.S. DEPARTMENT OF DEFENSE, et al.,             Case No. 1:22-cv-782

    Defendants.

**Plaintiff's Response to Defendant FBI's Motion for Summary Judgment
and Plaintiff's Cross-Motion for Summary Judgment**

Plaintiff, Ryan Milliron, files this his Response to Defendant FBI's Motion for Summary Judgment and his Cross-Motion for Summary Judgment, and respectfully states as follows:

**INTRODUCTION**

Plaintiff's Freedom of Information Act (FOIA) requests, which have been narrowed since litigation commenced, are in two basic parts. First, Plaintiff seeks FBI records of interviews of Rodney Joffe and Manos Antonakakis "during the period of March 1, 2016 through March 1, 2019 that are relevant to Russia, Trump, Alfa bank, or the hack of the DNC." Second, Plaintiff demand sought emails between Joffe and FBI Agent Tom Grasso.

In this Response and Cross-Motion, Plaintiff will only address the Joffe and Antonakakis interviews. Plaintiff will not pursue a challenge to the production of the Joffe and Grasso emails.

Context is necessary to fully understand the importance of Joffe and Antonakakis interviews and the confusing position the FBI has taken with respect to that FOIA request. We begin with the Joffe records which, at least in part, touch upon false allegations made in 2016 those aligned with the Hillary Clinton Campaign that the Trump Organization had secret communications with the Russian Alfa-Bank. Michael Sussmann, an attorney for the Clinton

Campaign and the Democratic National Committee (DNC), was indicted by the Government in September 2021 for making false statements to the FBI stemming "from a set of allegations brought by Sussmann to the FBI related to an alleged secret channel of communications between the Trump Organization and a Russian bank" (Alfa-Bank).[1] Sussmann falsely stated to the FBI's "General Counsel that he was not bringing these allegations to the FBI on behalf of any client" when, in fact, as alleged by the Government, he brought those allegations to the FBI on behalf of Rodney Joffe and the Hillary Clinton Presidential Campaign.[2]

Joffe was a key figure at Sussmann's trial. And at that trial, and in hearings concerning that criminal case, the Government itself disclosed and elicited testimony concerning Joffe's history as a confidential human source (CHS), some of the exact information Joffe relayed to the government, Joffe's misconduct as a source, his efforts to hide the political sources of his fraudulent Alfa-Bank information, and why Joffe was terminated as a CHS. This included:

- At Sussmann's trial, the Government painted a disturbing picture: Joffe abused his role as an FBI source to further the Alfa-Bank hoax to, along with Sussmann and others, "create an October surprise on the eve of the presidential election, a plan that used and manipulated the FBI." Exhibit 1 at p. 3.

- Joffe knew that the server at issue "was a spam email server" but he and Sussmann "claimed it was being used as a secret communication channel between the Trump organization and Russia." Exhibit 1 at p. 4.

- Joffe was working with disgraced research firm Fusion GPS in furthering the Alfa-Bank hoax. Exhibit 1 at p. 5.

- After the FBI opened its investigation into the alleged Trump Organization and Alfa-Bank ties, Joffe contacted Agent Grasso by phone and provided him with "information relating to communications between the Trump Campaign" and Alfa-Bank. Exhibit 2 at p. 3.

---

[1] U.S. Department of Justice, Grand Jury Indicts D.C. Attorney with Making False Statements to the FBI in 2016 Regarding Alleged Communications Between Trump Organization and Russian Bank, Sept. 16, 2021, https://www.justice.gov/archives/sco/pr/grand-jury-indicts-dc-attorney-making-false-statements-fbi-2016-regarding-alleged.

[2] *Id.*

- Joffe specifically asked Agent Grasso to not disclose his identity to other people at the FBI. Exhibit 2 at p. 4.

- Joffe did not disclose that he was working with representatives of a political campaign, he did not disclose that he was working with Fusion GPS on this project, and he did not disclose that the Alfa Bank information had arisen in the context of the Clinton Campaign's opposition research. Exhibit 2 at p. 6.

- Joffe did not bring the Alfa-Bank information to his handling agent, though that is the "tradition within the FBI." Exhibit 2 at p. 7.

- Playing both sides, Joffe – along with Sussmann – "leaked the Alfa-Bank allegations to a reporter at the *New York Times* with the hope and expectation that he would run a story about it." Exhibit 1 at p. 5.

- A Special Counsel prosecutor explained that this conduct from Joffe caused the FBI to terminate him as a source, elaborating that: "the very things he [Joffe] was doing as alleged in this case were a breach of what a source is supposed to do." Exhibit 3 at p. 3.

As Special Counsel Durham concluded in his report, Joffe – who "himself was an FBI CHS" – likely decided to provide the IP addresses to Agent Grasso anonymously "to create the appearance of corroboration."[3] Special Counsel Durham would further find that Joffe disseminated the Alfa-Bank "allegations despite having previously expressed and received from others expressions of serious doubts and differing views about their strength, and purposefully crafted a written analysis to conceal the weaknesses of the allegations."[4]

With respect to the records Plaintiff seeks concerning Manos Antonakakis, a Georgia Tech professor and researcher, his identity as a witness – not a CHS, but a witness – was confirmed through records released pursuant to Georgia's Open Records Act. As Plaintiff previously informed the Court, a July 24, 2021 email written by Antonakakis stated:

> "During one of my interviews with the Special Counsel prosecutor, I was asked point blank by Mr. DeFilippis, 'Do you believe that DARPA should be instructing you to investigate

---

[3] Special Counsel John H. Durham, Report on Matters Related to Intelligence Activities and Investigations Arising Out of the 2016 Presidential Campaigns, May 12, 2023, https://www.justice.gov/archives/media/1381211/dl at p. 262.
[4] *Id*. at p. 252.

the origins of a hacker (Guccifer_2.0) that hacked a political entity (DNC)?' Let that sync for a moment, folks. Someone hacked a political party (DNC, in this case), in the middle of an election year (2016), and the lead investigator of DoJ's special council would question whether US researchers working for DARPA should conduct investigations in this matter is 'acceptable'! While I was tempted to say back to him 'What if this hacker hacked GOP? Would you want me to investigate him then?', I kept my cool and I told him that this is a question for DARPA's director, and not for me to answer."[5]

That email reveals a number of important details. First, it confirms that Special Counsel Durham's office had multiple interviews with Antonakakis. Second, it demonstrates that Antonakakis was not a CHS at the time of these interviews, as it took place as part of Durham's broad inquiry into other investigations. And third, it provides specific details concerning the questions asked by Durham's team and the answers provided by Antonakakis. The revelations of this email spurred a Senate investigation led by led by Senators Ron Johnson and Chuck Grassley.[6]

Additionally, counsel for Antonakakis emailed Durham's team in July 2021, "noting that now that the special counsel has 'appropriately categorized Dr. Antonakakis as a witness,' they would happily discuss a follow-up meeting with Durham's team."[7]  Again, with respect to at least some of the interviews sought by Plaintiff, Antonakakis was a witness – not a CHS.

To summarize the argument below, the FBI's motion for summary judgment and its memorandum in support are insufficient and unsupported by the facts and by the law. Plaintiff cross-moves for summary judgment on the basis that the FBI's withholding is improper under FOIA.

---

[5] Margot Cleveland, The Federalist, Exclusive: Special Counsel's Office Is Investigating The 2016 DNC Server Hack, March 10, 2022, http://thefederalist.com/2022/03/10/exclusive-special-counsels-office-is-investigating-the-2016-dnc-server-hack/ (referenced email is embedded).
Enclosed Georgia Tech emails at page 7.
[6] Senator Ron Johnson, Sens. Johnson, Grassley Demand Records from DoD Research Agency on Potential Involvement in DNC Hack Attribution and Mueller Investigation, April 29, 2022, https://ronjohnson.senate.gov/2022/4/sens-johnson-grassley-demand-records-from-dod-research-agency-on-potential-involvement-in-dnc-hack-attribution-and-mueller-investigation.
[7] Margot Cleveland, The Federalist, Docs: Spygate Researchers Did Work For Former Special Counsel Robert Mueller, April 22, 2022, http://thefederalist.com/2022/04/22/docs-spygate-researchers-did-work-for-former-special-counsel-robert-mueller/.

**ARGUMENT**

**1. Standard of Review**

"To prevail on summary judgment, the government must show that it made a good faith effort to conduct a search for the requested records using methods reasonably expected to produce the requested information and that any withholding of materials was authorized within a statutory exemption." *Rimmer v. Holder*, 700 F.3d 246, 255 (6th Cir. 2012).

That framework is best analyzed under the framework of FOIA, which was enacted "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny" and reflects "a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." *Dep't of Air Force v. Rose,* 425 U.S. 352, 360–61, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976) (quotations and citations omitted).

**2. The FBI cannot withhold the interviews under Exemption 6**

Exemption 6 concerns "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The primary purpose of Exemption 6 "is to 'protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information.'" *Judicial Watch, Inc. v. U.S. Dep't of Justice*, 365 F.3d 1108, 1124 (D.C. Cir. 2004) quoting *Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 599 (1982).

In reviewing an agency's assertion of Exemption 6, courts generally follow a two-step process. First, a court determines "whether the records are personnel, medical, or similar files covered by Exemption 6." *Am. Immigr. Laws. Ass'n v. Exec. Off. for Immigr. Rev.*, 830 F.3d 667, 673 (D.C. Cir. 2016) (quotations omitted) (cleaned up). If the records meet that criteria, courts then "determine whether their disclosure would constitute a clearly unwarranted invasion of personal

privacy." *Am. Immigr. Laws. Ass'n v. Exec. Off. for Immigr. Rev.*, 830 F.3d 667, 673 (D.C. Cir. 2016) (quotations omitted).

It is clear that the interviews sought by Plaintiff do not involve personnel records, medical records, or similar types of records, such as immigration or citizenship records. *See U. S. Dep't of State v. Washington Post Co.*, 456 U.S. 595, 602, 102 S. Ct. 1957, 1962, 72 L. Ed. 2d 358 (1982) ("The citizenship information sought by respondent satisfies the "similar files" requirement of Exemption 6[.]"). But even if the documents were to meet that criteria, disclosure would not constitute a clearly unwarranted invasion of personal privacy." *Am. Immigr. Laws. Ass'n v. Exec. Off. for Immigr. Rev.*, 830 F.3d 667, 673 (D.C. Cir. 2016). As Plaintiff has thoroughly documented, it was the Government that disclosed Joffe's wrongful conduct and history as a source with the FBI. And it was Antonakakis who discussed his interviews and the subject matter of those interviews with Special Counsel Durham's Office.

### 3. The FBI cannot withhold the interviews under Exemption 7(C)

Exemption 7(C) covers "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552 (b)(7)(C).

Exemption 7(C) generally covers "avoiding disclosure of personal matters" and the "disclosure of records regarding private citizens." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 762, 766 (1989). The Sixth Circuit has noted, for example, that Exemption 7(C) protects the disclosure of "embarrassing and humiliating facts." *Detroit Free Press v. U.S. Dep't of Justice*, 829 F.3d 478, 481 (6th Cir. 2016). Should there be a privacy interest, courts "must balance the privacy interest in withholding the redacted information with the public

interest in its release." *Rimmer v. Holder*, 700 F.3d 246, 256 (6th Cir. 2012) (quotations omitted) (cleaned up).

The FBI maintains that if it were to acknowledge responsive documents, then they could receive negative attention or be stigmatized or adversely affected. However, these interviews do not concern personal matters or facts that are humiliating or embarrassing – we can see that from the Antonakakis email where he discusses DARPA. These interviews concern serious investigative matters involving Joffe and Antonakakis, two tech-savvy individuals. The subject matter sought by Plaintiff are not inquiries into salacious allegations.

The FBI argues Plaintiff "fails to articulate a public interest in the requested information" and that "the documents he seeks would reveal little about the FBI's investigation into the DNC hack or other agency misconduct." Defendant FBI's Memorandum in Support of Motion for Summary Judgment, ECF No. 66 at p. 10.

The public interest, however, is significant. Simply put, the Joffe records concern an attempt to manipulate the FBI to influence the 2016 election with the Alfa-Bank allegations – and whether this same individual with deep ties to the Hillary Clinton Campaign was attempting to influence the FBI's investigation of the DNC hack. Furthermore, the Antonakakis interviews – if his email is accurate – would confirm that DARPA is misleading the public about its involvement in the DNC hack attribution. After all, once the Antonakakis email became public, DARPA's chief of communications denied involvement "in efforts to attribute the DNC hack."[8]

---

[8] Margot Cleveland, The Federalist, Docs: Spygate Researchers Did Work For Former Special Counsel Robert Mueller, April 22, 2022, http://thefederalist.com/2022/04/22/docs-spygate-researchers-did-work-for-former-special-counsel-robert-mueller/.

**4. The FBI cannot withhold the interviews under Exemption 7(D)**

Exemption 7(D) protects the disclosure of information in records that "could reasonably be expected to disclose the identity of a confidential source" or "information furnished by a confidential source." 5 U.S.C. § 552(b)(7)(D).

"The mere fact that a person or institution provides information to a law enforcement agency does not render that person a 'confidential source' within the meaning of exemption 7(D)." *Campbell v. U.S. Dep't of Just.*, 164 F.3d 20, 34 (D.C. Cir. 1998), as amended (Mar. 3, 1999). Instead, under Exemption 7(D), the question is "whether the requested *document* is of the type that the agency usually treats as confidential, but whether the particular *source* spoke with an understanding that the communication would remain confidential." *U.S. Dep't of Just. v. Landano*, 508 U.S. 165, 172, 113 S. Ct. 2014, 2019, 124 L. Ed. 2d 84 (1993) (emphasis in original).

This Circuit holds that where "a confidential source is later revealed, we nonetheless restrict public access to documents under [Exemption 7(D] so long as the informant and the agency intended the identity of the source to remain undisclosed at the time the agency compiled the information." *Rimmer v. Holder*, 700 F.3d 246, 261 (6th Cir. 2012).

"The agency invoking Exemption 7(D) bears the burden of proving that it applies." *Roth v. U.S. Dep't of Just.*, 642 F.3d 1161, 1184 (D.C. Cir. 2011). In the present case, the Government has not established that Exemption 7(D) applies to Antonakakis. The fact that he interviewed with Special Counsel Durham indicates that he was not a confidential source.

The application of Exemption 7(D) to Joffe is a touch different because the Government outed him as a confidential source and disclosed the information Joffe provided. But there is no suggestion that the FBI promised Joffe anonymity when he provided the fraudulent Alfa-Bank information to the FBI with the request that he remain anonymous. Furthermore, information

relating to what Joffe provided to the FBI was made public by the Government. Regardless, the FBI has not provided adequate confirmation that these two sources received promises of confidentiality. *Rugiero v. U.S. Dep't of Just.*, 257 F.3d 534, 552 (6th Cir. 2001) ("[T]he agency must provide assurances that sources in fact received promises of confidentiality before withholding information under section 552(b)(7)(D)."

### 5. The FBI's application of *Glomar* is inappropriate

The FBI has asserted it is entitled to the *Glomar* response under Exemptions 6, (b)(7)(C), and (b)(7)(D). The FBI maintains that if the agency "were to acknowledge the existence of such records, it would associate these individuals with an FBI investigation, which 'would trigger harm under FOIA Exemptions (b)(6) and (b)(7)(C)' and undermine the very purpose of the exemptions." Defendant FBI's Memorandum in Support of Motion for Summary Judgment, ECF No. 66 at p. 12. The FBI also asserts "the requested information is protected from disclosure and the FBI properly denied Plaintiff's request under Exemption 7(D)." *Id*. at p. 13.

However, the Government's confirmation of Joffe's history with the FBI and the Antonakakis email make it implausible for the FBI to assert its *Glomar* response and are sufficient for Plaintiff to overcome the *Glomar* response. "[I]n the context of a *Glomar* response, the public domain exception is triggered when the prior disclosure establishes the *existence* (or not) of records responsive to the FOIA request, regardless whether the contents of the records have been disclosed." *Marino v. Drug Enf't Admin*., 685 F.3d 1076, 1081 (D.C. Cir. 2012) (quotation omitted) (emphasis in original).

In the present case, Plaintiff has established that the Government disclosed the existence of at last some of the Joffe records – most notably his call with Agent Grasso concerning the Alfa-Bank information. *See ACLU v. CIA*, 710 F.3d 422, 430 (D.C. Cir. 2013) (Stating a "plaintiff can

overcome a *Glomar* response by showing that the agency has already disclosed the fact of the existence (or nonexistence) of responsive records, since that is the purportedly exempt information that a *Glomar* response is designed to protect."). Likewise, Plaintiff has established the existence of the Antonakakis interviews from his own words. This is sufficient to overcome the FBI's *Glomar* response.

## 6. The Hammer Declaration should be struck

In support of its memorandum, the FBI submitted the declaration of Shannon R. Hammer, who currently serves as the Acting Section Chief of the Record/Information Dissemination Section of the FBI. Declaration of Shannon R. Hammer, ECF No. 66-1 at ¶ 1. In that declaration, Ms. Hammer makes the following claims:

- "In requests seeking records on an individual, where the requester has not provided any documentation to suggest that the FBI has officially acknowledged that the individual is a CHS, the FBI must refuse to confirm or deny whether or not responsive records exist. The FBI does this in any instance when records about an unacknowledged CHS could be implicated, to prevent harm to CHSs individually and to the CHS program overall." ¶ 29.

- "The FBI issued a privacy Glomar to protect the privacy interests concerning the individuals identified in Plaintiff's FOIA request. Here, Plaintiff is seeking records that, should they exist, would provide confirmation that such individuals were associated or acted as confidential human sources by providing non-public information during an FBI interview or provided confidential source reporting information. Official confirmation could reasonably be expected to draw negative and unwanted attention to these individuals; could subject them to harassing inquiries and otherwise stigmatize and adversely affect them. Plaintiff failed to provide any information to articulate a public interest in disclosure under the FOIA. As such, the substantial privacy interests of these third party individuals outweigh the non-existent public interest in disclosure." ¶ 31.

It appears that Ms. Hammer is unaware that the Government disclosed Joffe as a confidential human source. And it is the position of Ms. Hammer that Plaintiff never provided documentation to suggest that the FBI acknowledged Joffe as a source. However, concerning Joffe, Plaintiff has provided documentation that he was officially acknowledged as a CHS by the Department of Justice. *See* ECF No. 59-1 at ¶¶ 12-14 (discussing how Joffe's history as a CHS

was disclosed during the Sussmann trial and Special Counsel Durham's revelation that Joffe provided the Alfa-Bank data to an FBI Agent).

In effect, the Hammer Declaration is making a factual issue where none exists. While self-serving affidavits or declarations typically deal with prior testimony, they should also be stricken if it is "an attempt to create a sham fact issue." *France v. Lucas*, 836 F.3d 612, 622 (6th Cir. 2016). As a result, any assertion in Ms. Hammer's declaration that *Glomar* applies because Joffe was not confirmed as a source by the Government should be struck.

## CONCLUSION

In conclusion, and for these reasons, Plaintiff respectfully requests the Court deny Defendant FBI's Motion for Summary Judgment and grant Plaintiff's Cross-Motion for Summary Judgment.

Respectfully submitted,

Dated: September 16, 2025

/s/ *Travis Miller*
Travis Miller
Texas Bar No. 24072952
PO Box 6853
Austin, TX 78762
Tel: 430-222-8184
Email: twmlegal@gmail.com